[No. A114941. First Dist., Div. Five. Mar. 29, 2007.]

CITIZENS FOR A MEGAPLEX-FREE ALAMEDA, Plaintiff and Appellant,
v.
CITY OF ALAMEDA et al., Defendants and Respondents;
ALAMEDA ENTERTAINMENT ASSOCIATES, L.P., Real Party in Interest
and Respondent.

94

**COUNSEL**

Brandt-Hawley Law Group, Susan Brandt-Hawley and Paige J. Swartley for Plaintiff and Appellant.

Shute, Mihaly & Weinberger, Ellen J. Garber, Robert S. Perlmutter; Sheridan J. Pauker; and Teresa L. Highsmith, City Attorney, for Defendants and Respondents.

Donald J. Black for Real Party in Interest and Respondent.

OPINION

**MILLER, J.**[*]—The City of Alameda (the City) initiated a redevelopment project involving both the rehabilitation of the historic Alameda Theatre and the construction of an adjacent multiscreen cineplex and parking structure. The project is being carried out pursuant to an agreement between the City and a developer, real party in interest Alameda Entertainment Associates, L.P. (Alameda Entertainment Associates). The City determined that the project did not require preparation of an environmental impact report (EIR) under the California Environmental Quality Act (CEQA), Public Resources Code section 21000 et seq.,[1] and instead adopted a mitigated negative declaration. Citizens for a Megaplex-Free Alameda (Citizens), an unincorporated association, subsequently filed a petition for writ of mandamus against the respondents[2] alleging that the City's failure to require preparation of an EIR for the project violated CEQA. Citizens now appeals from the judgment of the Alameda County Superior Court denying its petition.

The central issue in this appeal is whether the City's actions are governed by the "fair argument" standard drawn from section 21151 or by section 21166, which provides that no subsequent or supplemental EIR shall be required except in limited circumstances. We conclude, as did the trial court, that section 21166 applies. We further hold that Citizens has failed to show that the City's actions were unsupported by substantial evidence, and finding none of Citizens's other contentions persuasive, we will affirm.

FACTUAL AND PROCEDURAL BACKGROUND

This case comes to us with a lengthy record. We summarize only those facts relevant to an understanding of the issues on appeal and discuss additional facts in the course of our legal analysis to the extent they are pertinent.

*The Alameda Theatre*

This appeal arises out of the City's plans for the rehabilitation of the historic Alameda Theatre. The theater was built in 1932 and designed by the

---

[*]Judge of the Superior Court of San Francisco County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] All further undesignated statutory references are to the Public Resources Code.

[2] The respondents in this case are the City of Alameda, the Community Improvement Commission of the City of Alameda, the Planning Board of the City of Alameda, and the Alameda City Council, as well as Alameda Entertainment Associates. We will generally refer to the respondents collectively as the City unless the context requires that they be discussed individually.

renowned San Francisco architecture firm of Miller & Pflueger, which also designed the Castro Theater in San Francisco and the Paramount Theater in Oakland. The Alameda Theatre has been described as "a masterpiece of Moderne architecture" and is known for its spectacular Art Deco interior. It is Alameda's only surviving Art Deco theater and is listed on the National Register of Historic Places as one of the structures contributing to Alameda's Park Street Historic Commercial District. The theater was also designated as a "historic monument" by the City's historical advisory board. Since 1979, however, the theater has not been used as a cinema and it has been vacant and underutilized. The building's interior has begun to deteriorate and there has been no substantial capital investment or rehabilitation over the years.

### The City's Plans to Restore the Alameda Theatre

In 2000, the City began to examine options for rehabilitating the theater and issued a request for proposals for revitalizing the building and reopening it as a movie theater. The City received no responses to its request and ultimately concluded that a single-screen movie theater was not a feasible development alternative. The City determined that its best option was to work with a private developer to construct additional movie screens on a parcel adjacent to the historic Alameda Theatre. The City therefore decided to exercise its authority under the Community Redevelopment Law, Health and Safety Code section 33000 et seq., and enter into a disposition and development agreement (DDA) to accomplish its objective. The City's community improvement commission (Commission) then executed an exclusive negotiation agreement with real party in interest Alameda Entertainment Associates to fashion a proposal for revitalizing the historic theater and constructing a new multiscreen cineplex and parking structure.

Reduced to its essence, the project has three components—rehabilitation of the historic Alameda Theatre, a new multiscreen cineplex, and a new six-level 350-space parking structure. We will refer to the three components of this project collectively as the "Alameda Theatre Project."

### Initial Planning, Negotiation of the DDA, and Drafting of the Mitigated Negative Declaration

The City sought to obtain federal funds for the Alameda Theatre Project, and in June and July 2004, invited public comment and held a public hearing on its application for federal grants "to assist with economic revitalization of the Park Street downtown area by financing the development and construction of a parking structure and/or commercial space." On October 20, 2004, the City published a "notice of scoping meeting" which it described as "[a] public meeting to take comments on the proposed scope of environmental

review (anticipated Mitigated Negative Declaration/Environmental Assessment) for the Alameda Theatre rehabilitation and associated parking structure." In November, the City's planning board held the noticed scoping meeting concerning environmental review under both CEQA and the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

On December 10, 2004, the City issued the draft mitigated negative declaration (MND),[3] which described the three components of the Alameda Theatre Project in detail. The draft MND also contained maps showing the placement of the proposed cineplex and parking structure and used visual simulations to depict the scale of the proposed new construction in relation to the historic theater and surrounding buildings. In addition, the draft MND discussed each of the Alameda Theatre Project's potentially significant environmental impacts and included extensive analyses in support of the conclusions reached in the draft MND.

Upon issuance of the draft MND, the City announced a 30-day comment period. Copies of the MND were made available for review at state and local libraries. A copy of the draft was also published on the City's Web site, and a notice of its availability for review was issued in a local newspaper, the Alameda Journal. Copies were also disseminated to all interested groups, individuals, and agencies. In response, the City received six letters commenting on the draft MND. Neither Citizens nor any of its individual members filed comments on the draft MND.

Before adopting the MND, the City held a number of public meetings on the Alameda Theatre Project. The historical advisory board held a public hearing on February 3, 2005. The City's planning board held three public meetings at which it conducted study sessions on the matter, reviewed draft design guidelines, and took public comments. As a result of these meetings,

---

[3] Guidelines for implementation of CEQA adopted by the Secretary for Resources define a "negative declaration" as "a written statement by the lead agency briefly describing the reasons that a proposed project, not exempt from CEQA, will not have a significant effect on the environment and therefore does not require the preparation of an EIR." (Cal. Code Regs., tit. 14, § 15371 (hereafter all references to title 14 are cited as Guidelines).) A " '[m]itigated negative declaration' means a negative declaration prepared for a project when the initial study has identified potentially significant effects on the environment, but (1) revisions in the project plans or proposals made by, or agreed to by, the applicant before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment." (Guidelines, § 15369.5; see *Snarled Traffic Obstructs Progress v. City and County of San Francisco* (1999) 74 Cal.App.4th 793, 797 [88 Cal.Rptr.2d 455] (*STOP*) ["In an obvious sense, an EIR and a negative declaration are the two sides of the same coin, the either/or options available to a public agency considering a project."].)

the design guidelines were revised to reflect the comments, and the changes were incorporated into the DDA. The city council then held a public meeting on March 15, 2005, at which it considered the design guidelines and accepted public comments. It then approved the design guidelines for the Alameda Theatre Project.

Applications were submitted for a use permit for the parking structure and design review for both the cineplex and the parking structure. Additional public meetings permitted interested parties to voice their opinions on the proposed project. Thus, revised designs were proposed and discussed at a meeting of the planning board on March 28, 2005. The historical advisory board held another public meeting on April 7, 2005, to consider public comments on the designs for both the cineplex and parking structure. The City's transportation commission held a public meeting on April 27, 2005, to discuss the parking structure. Neither Citizens nor any individual identified as one of its members submitted comments at these meetings.

### Approval of the MND and DDA

On May 3, 2005, the city council and the Commission held a joint public hearing to consider both adoption of the MND and approval of execution of the DDA with Alameda Entertainment Associates. The DDA imposed various obligations on the City regarding the Alameda Theatre Project. In the DDA, the City undertook to acquire, at its sole expense, the land necessary for the project. The City also promised to provide funding in the form of payments, grants, and loans. In addition, the DDA obligated the City to grade and improve the site, renovate the historic theater, and construct the parking structure. It also required that the City lease the Alameda Theatre and cineplex to Alameda Entertainment Associates and cooperate with Alameda Entertainment Associates in processing and securing any subsequent permits and approvals necessary for completion of the project.

At the public hearing, the city council and the Commission heard from a number of speakers on the proposed project. No representative of Citizens spoke at the hearing. After the hearing, both the city council and the Commission voted unanimously to adopt the MND and to approve execution of the DDA. To that end, the city council passed resolution No. 13834 adopting the MND and approving execution of the DDA. In the resolution, the city council expressly found that the conditions of approval set forth in the MND "reduce all environmental impacts to less than a significant level." The city council further found "on the basis of the whole record before it . . . that there is no substantial evidence that the [Alameda Theatre] Project will have a significant effect on the environment." It therefore adopted the MND and approved the DDA. The resolution also authorized the city

clerk to file a notice of determination[4] following adoption of the resolution. On May 4, 2005, the City filed a notice of determination pursuant to CEQA.

*Implementation of the Alameda Theatre Project*

After passage of resolution No. 13834 and the approval of the MND and the DDA, the City took steps to implement the Alameda Theatre Project. To implement one of the mitigation measures approved as part of the MND, the historical advisory board granted a certificate of approval for structural alterations to the historic theater. The approval was preceded by the required public notice and was announced by the filing of a notice of determination pursuant to CEQA. It was at the historical advisory board's June 2, 2005 meeting that a representative of Citizens first voiced opposition to the project.

Earlier, on May 9, 2005, the City's planning board had accepted the revised preliminary designs for the cineplex and parking garage. The planning board then held two public hearings to consider whether to grant final design review for the cineplex and a use permit and design review for the parking structure. After hearing from the public, the planning board voted on June 27, 2005, to approve the requested use permit and design reviews. Two individuals appealed the planning board's decision on behalf of Citizens. The appeal documents do not mention CEQA, but these appellants later submitted letters urging that an EIR be prepared. Following a public hearing, on August 16, 2005, the city council voted to adopt a resolution upholding the planning board's decisions.

On September 29, 2005, the planning board held a public hearing after which it approved the use permit for the cineplex. Citizens filed an appeal from this action, but the appeal documents do not mention CEQA among the grounds for objection. The city council upheld the planning board's decision by resolution on November 1, 2005.

In both its August 16, 2005 and November 1, 2005 resolutions, the city council found that since the adoption of the MND on May 3, 2005, "there has been no change to the project or substantial changes in circumstances or new information that would warrant subsequent environmental analysis in accordance with CEQA . . . ." The City filed notices of determination for each of these actions.

---

[4] The Guidelines define a "notice of determination" as "a brief notice to be filed by a public agency after it approves or determines to carry out a project which is subject to the requirements of CEQA. . . ." (Guidelines, § 15373.)

*Final Design Review*

After the city council's August 16, 2005 hearing, the City retained a new architect to revise the exterior designs of the cineplex and parking structure to reduce their scale and bulk and to include greater evocation of Art Deco style. At a hearing on November 1, 2005, the city council gave its preliminary approval of the revised designs. The following month, the City's National Historic Preservation Act consultant submitted his report and expressed support for the revised designs. The City later awarded construction bids for the Alameda Theatre Project.

*Citizens's Mandamus Action*

On October 3, 2005, Citizens filed a petition for writ of mandamus in Alameda County Superior Court. The petition alleged a single cause of action under CEQA. The petition asserted that an EIR should have been prepared before the City considered discretionary actions to approve the project because the "administrative record contains substantial evidence supporting a 'fair argument' that the project may result in significant environmental impacts . . . ." The petition also claimed that the initial environmental study and the MND were inadequate. It further alleged that "[t]he City inappropriately relied upon and applied the inapplicable 'supplemental' environmental review provisions of the CEQA Guidelines, and failed to apply the 'fair argument' standard to the MND." The petition alleged that even under the substantial evidence standard, the City had failed to address the significant new information provided in a report prepared by local historian Woodruff Minor. Finally, the petition claimed that the City's findings certifying the MND were inadequate, incomplete, and unsupported by substantial evidence in the record. Citizens's petition sought issuance of a peremptory writ of mandate ordering the City to set aside and void all approvals for the Alameda Theatre Project "until full compliance with CEQA is achieved, including certification of an adequate Environmental Impact Report." The petition also asked that the court enjoin "any physical actions in furtherance of the project while this Petition is pending, including but not limited to grading, demolition, or construction."[5]

---

[5] On December 6, 2005, Citizens filed a supplemental petition for writ of mandamus which was substantially identical to its original petition but which included additional allegations regarding the city council's November 1, 2005 approvals. Like the original petition, the supplemental petition asserts a single cause of action under CEQA and requests the very same relief as the original petition.

*The Trial Court's Ruling*

The trial court heard argument on the petition on April 27, 2006. On June 30, 2006, the trial judge filed a lengthy statement of decision denying Citizens's petition for writ of mandate. The trial judge held that Citizens's challenges to the City's approval of the DDA and adoption of the MND were barred by the statute of limitations, because Citizens had not brought suit within 30 days of issuance of the May 4, 2005 notice of determination. The trial judge also concluded that Citizens had standing to challenge the August 16 and November 1, 2005 approvals, ruling that the City was estopped from contending that Citizens had failed to exhaust administrative remedies by not properly raising CEQA grounds in its appeals from the planning board's decisions. With respect to Citizens's challenges to those approvals, the trial court held that substantial evidence supported the City's decision that there had been no substantial changes to the project since adoption of the MND and no new information that would warrant subsequent environmental analysis. The trial judge rejected Citizens's argument that the City's decision should be reviewed under the "fair argument" standard, holding that the fair argument standard "is not the proper standard for reviewing the City's decision that no subsequent MND is required."

The trial court entered a final judgment denying the petition for writ of mandate on July 13, 2006. Citizens filed an appeal from that judgment on July 24, 2006.

DISCUSSION

Citizens brought its petition for writ of mandamus as a challenge to the City's August 16 and November 1, 2005 actions upholding the planning board's decisions to approve (1) the design review and use permit for the proposed parking structure and (2) the use permit for the cineplex. Its arguments in this court, however, are not directed specifically at those decisions. Instead, Citizens makes more general arguments regarding the adequacy of the City's environmental review. Citizens contends first that substantial evidence in the record supports a fair argument that the Alameda Theatre Project may have significant effects on the environment, and thus the City was required to prepare an EIR. Citizens argues that the MND adopted by the City in lieu of an EIR did not adequately address relevant environmental impacts. Citizens next argues that even if the supplemental review

provisions of section 21166 apply, new information became available after adoption of the MND that triggered the need for an EIR. Finally, Citizens challenges the adequacy of the City's findings that no further environmental review was required. We will address each of these issues in turn.

## I. *Standard and Scope of Review*

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: the appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 [53 Cal.Rptr.3d 821, 150 P.3d 709].) There is thus no dispute about the standard of review that we apply to the trial court's decision; we review it de novo. (*Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 580 [18 Cal.Rptr.3d 814].)

The parties strongly disagree, however, on the standard applicable to the City's actions. Indeed, that disagreement forms the heart of this appeal. Because the determination of the proper standard necessarily defines the permissible scope of this court's inquiry, we will explain both the parties' contentions and the differing standards of review in some detail.

### A. *"Fair Argument" versus Supplemental Review*

■ Citizens contends that our review in this case is governed by the "fair argument" standard. This standard is derived from section 21151, which requires an EIR on any project "which may have a significant effect on the environment." (§ 21151, subd. (a).) Section 21151 "mandates preparation of an EIR in the first instance 'whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' [Citation.]" (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316 [8 Cal.Rptr.2d 473] (*Sierra Club*).) If there is substantial evidence of such an impact, then contrary evidence is not adequate to support a decision to dispense with an EIR. (*League for Protection of Oakland's etc. Historic Resources v. City of Oakland* (1997) 52 Cal.App.4th 896, 904–905 [60 Cal.Rptr.2d 821].) The question addressed by section 21151 is whether *any* environmental review is warranted. (*Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1073 [230 Cal.Rptr. 413] (*Bowman*).) At the initial stage of the process, section 21151 "reflects a preference for resolving doubts

in favor of environmental review." (*Sierra Club, supra*, at pp. 1316–1317.) Citizens contends that, viewed under the fair argument standard, the record demonstrates that City was required to prepare an EIR prior to approving the DDA.

■ For its part, the City argues that this case is governed by section 21166.[6] The City contends that the fair argument standard does not apply here because that standard only applies to an agency's decision to adopt an MND *in the first instance*. Because the notice of determination announcing adoption of the MND was filed in May 2005, but Citizens did not file its suit until October of that year, the City asserts that the 30-day statute of limitations for challenging the MND has passed and that section 21166 controls our review. (§ 21167, subd. (b) [actions alleging that public agency "has improperly determined whether a project may have a significant effect on the environment shall be commenced within 30 days" from filing of notice of determination]; see *STOP, supra*, 74 Cal.App.4th at p. 797 ["once a negative declaration is issued or an EIR is completed, that decision is protected by concerns for finality and presumptive correctness"].) "[S]ection 21166 comes into play precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR [or negative declaration] has long since expired [citation], and the question is whether circumstances have *changed* enough to justify *repeating* a substantial portion of the process." (*Bowman, supra*, 185 Cal.App.3d at p. 1073, original italics.) Section 21166 thus prohibits agencies from requiring subsequent or supplemental EIR's unless the conditions specified in the statute are satisfied. (*Bowman, supra*, at pp. 1073–1074.) The City contends that our review of its denial of Citizens's appeals is limited to determining whether the City's decision was supported by substantial evidence. (*STOP, supra*, 74 Cal.App.4th at p. 800; *Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1481 [277 Cal.Rptr. 481] (*Benton*).) Since no action challenging the May 4, 2005 notice of determination was filed within 30 days of the issuance of the notice of determination, the City contends that the MND is now final and conclusive on all persons unless one of the triggering conditions requiring a subsequent

---

[6] Section 21166 provides: "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

The Guidelines state that the criteria of section 21166 apply to cases in which "an EIR has been certified *or a negative declaration adopted for a project*." (Guidelines, § 15162, subd. (a), italics added.)

EIR is met. (§ 21080.1, subd. (a) [MND "shall be final and conclusive on all persons, including responsible agencies, unless challenged as provided in Section 21167"].)

In response, Citizens acknowledges that its action was filed more than 30 days after the May 4, 2005 notice of determination announcing both the execution of the DDA and adoption of the MND. It contends, however, that the City's action in approving the DDA did not constitute an "approval" of a "project" as those terms are defined in CEQA and the Guidelines. (See § 21065 [defining "project"]; Guidelines, § 15352 [defining "approval"].) Citizens asserts that the "project" in this case is the Alameda Theatre restoration, cineplex, and parking structure; the "project" is not the DDA. Accordingly, resolution No. 13834 was not an "approval" of the "project" for CEQA purposes. In Citizens's view, the "project" was not fully approved "until all land use approvals for the [Alameda Theatre Project] were in place." Citizens claims that the "overall project approval" occurred only after approval of the two use permits and design review. According to Citizens, it was at this point that the statute of limitations began to run, and therefore its action is timely.

At this juncture, it is useful to clarify what Citizens does, and does not, claim. Two related points are worth emphasizing. First, Citizens has no quarrel with the City's decision to conduct an environmental review prior to approval of execution of the DDA. Indeed, it could hardly contend otherwise, because under the Guidelines such review was required. (Guidelines, § 15004, subd. (a) ["Before granting *any approval* of a project subject to CEQA, every lead agency or responsible agency *shall consider* a final EIR or negative declaration . . . ." (Italics added.)].) And in fact, in this court Citizens has repeatedly conceded that the timing of the City's environmental review was appropriate.[7] Second, "Citizens agree[s] . . . that 'the environmental review accompanying the first discretionary approval must evaluate the impacts of the ultimate development authorized by that approval.' " It further agrees that the MND "purported to consider the entire . . . project." Thus, Citizens challenges neither the timing nor the scope of the MND.

---

[7] As Citizens explains in its reply brief, "Citizens agree both that the MND purported to consider the entire [Alameda Theatre] project *and* that it was prepared at the proper time before approval of *any* discretionary piece of the project. . . . [¶] Citizens' straightforward point, repeatedly stated, is not that preparing the MND prior to the DDA was too soon or that it did not attempt to study the entire [Alameda Theatre] project. Its point is that the MND *was inadequate* in light of potentially significant environmental impacts of the . . . project and so preparation of an EIR is mandated by law." (Original italics.) In other words, "[t]he timing of environmental review . . . was appropriate here but the *level* of review was blatantly inadequate." (Original italics.)

Instead, what Citizens seeks to challenge is the "adequacy" of the MND. Citizens contends the MND did not adequately analyze the impacts of the development at issue and that an EIR was required by law. Citizens attempts to draw a distinction "between (1) the timing of *conducting* environmental review and (2) the statute of limitations to *challenge* adequacy of environmental review." (Original italics.) Because the DDA was subject to a number of subsequent discretionary approvals, Citizens contends that the redevelopment was not fully approved until all land use approvals were in place. Citizens argues that its action was timely because it was filed "within 30 days of the City's posting of [notices of determination] for the project use permits and design."

Thus, the parties' disagreement over whether Citizens's suit was timely filed revolves around the definition of the terms "project" and "approval" for purposes of CEQA. We therefore turn to an examination of how these two terms have been defined in the statute, the Guidelines, and in case law. As we explain, our resolution of the definitional issue determines the appropriate standard of review.

> B. *The Activity Contemplated by the DDA Is a "Project" Under CEQA.*

In pertinent part, CEQA defines a "project" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] . . . [¶] (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (§ 21065.) The Guidelines explain further that "project" "refers to the *activity* which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Guidelines, § 15378, subd. (c), italics added.)

Citizens bases its argument on the introductory clause of the Guidelines definition of "project," taken out of context, which states that " '[p]roject' means the whole of an action . . . ." (Guidelines, § 15378, subd. (a).)[8] From this, Citizens reasons that the May 4, 2005 notice of determination cannot

---

[8] Guidelines section 15378, subdivision (a) goes on to state that a " '[p]roject' means the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and that is any of the following . . . ." This Guideline is in contradistinction to Guidelines section 15378,

have announced the "approval" of "the project," because "[t]he DDA is not the . . . project, but just a first step." Because the DDA contained a number of contingencies and required several further discretionary approvals from the City, Citizens argues that its action was timely because it was filed within 30 days of the notices of determination relating to the use and design approvals.

■ Citizens's argument misapprehends the definition of "project." Under CEQA, "project" "refers to the *underlying activity* which may be subject to approval by one or more governmental agencies; it does not refer to each of the several approvals sequentially issued by different agencies." (*Committee for a Progressive Gilroy v. State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847, 863 [237 Cal.Rptr. 723], italics added; see also Guidelines, § 15378, subd. (c).) "This definition ensures that the action reviewed under CEQA is not the approval itself but the development or other activities that will result from the approval." (1 Kotska & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2006) § 4.19, p. 166 (hereafter Practice Under CEQA).) Here, the underlying activity is quite plainly the work agreed to by the parties to the DDA—the restoration of the Alameda Theatre and the construction of the cineplex and parking structure. This constitutes the "project" within the meaning of CEQA. Having conceded that the City's environmental review occurred at the correct time and that the MND purported to consider the entire underlying activity, Citizens cannot now argue that the DDA "is not a project merely because further decisions must be made before" the theater is renovated and the cineplex and parking structure are actually constructed. (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 795 [187 Cal.Rptr. 398, 654 P.2d 168], disapproved on other grounds in *Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 918 [13 Cal.Rptr.2d 245, 838 P.2d 1198].)

C. *The City Council's Adoption of Resolution No. 13834 Constituted "Approval" of the "Project."*

■ It is equally clear that the city council's adoption of resolution No. 13834 in May 2005 authorizing execution of the DDA constituted "approval" of the "project." CEQA itself does not define the term "approval," but under the Guidelines an "approval" is "the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person." (Guidelines, § 15352, subd. (a).) Legislative action in regard to a project, such as the city council's adoption of resolution No. 13834, often constitutes approval. (Guidelines, § 15352,

---

subdivision (b), which defines what a project does not include, such as proposals for legislation to be enacted by the Legislature or continuing administrative or maintenance guidelines. (Guidelines, § 15378, subd. (b).)

subd. (b).) Contrary to Citizens's claims, the DDA certainly "commits [the City] to a definite course of action" with respect to the Alameda Theatre Project. (*Id.*, subd. (a).)

Under the Guidelines, "approval" for a private project "occurs upon *the earliest commitment to issue* or the issuance by the public agency of a discretionary contract, grant, subsidy, loan, or other form of financial assistance, lease, permit, license, certificate, or other entitlement for use of the project." (Guidelines, § 15352, subd. (b), italics added.) A review of the DDA demonstrates that its provisions bring it squarely within this definition. For example, the DDA obligates the City, acting through the Commission, to acquire the parcels of real property needed to assemble the site. Under the DDA, "[a]ll costs incurred in connection with the acquisition of the [site property] shall be borne by Commission." The financial provisions of the DDA require the City to provide the developer with a grant of $675,000, a loan of up to $1.4 million, and a loan of $850,000 for furniture, fixtures, and equipment. Thus, the DDA is indisputably a commitment by the City to issue grants, loans, and other forms of financial assistance. The City's undertaking to issue such financial assistance is an "approval" as defined by the Guidelines. (Guidelines, § 15352, subd. (b).)

Nor do these financial provisions represent the sum of the City's obligations under the DDA. The DDA also obligates the City to: (1) perform demolition, grading, removal, and remediation work at the site, (2) renovate the Alameda Theatre, and (3) construct the parking garage. Under the DDA, the costs of this work are borne solely by the Commission. Furthermore, the DDA obligates the City to lease the Alameda Theatre and cineplex property to Alameda Entertainment Associates and requires the City to cooperate with Alameda Entertainment Associates in securing the subsequent permits and approvals envisaged in the agreement. Our examination of these provisions leaves us with no doubt that the City's execution of the DDA constituted an "approval" as that term is defined in the Guidelines.

Case law amply supports our conclusion on this point. For example, in *Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511 [98 Cal.Rptr.2d 334],[9] the court held that the town had committed itself to a definite course of action when it adopted a redevelopment plan and certified the plan's EIR. (*Id.* at p. 535.) This was true although the redevelopment plan contained some 72 proposed projects, the specific characteristics of which were unknown at the time the EIR was prepared. (*Id.* at pp. 524–525.) By adopting the redevelopment plan, the

---

[9] Superseded on other grounds by statute as stated in *Citizens for Responsible Equitable Environmental Development v. City of San Diego Redevelopment Agency* (2005) 134 Cal.App.4th 598, 607–608 [36 Cal.Rptr.3d 249].

projects were "deemed approved for purposes of CEQA." (*Id.* at p. 536; cf. *Santa Margarita Area Residents Together v. San Luis Obispo County Bd. of Supervisors* (2000) 84 Cal.App.4th 221, 229 [100 Cal.Rptr.2d 740] [county committed itself to definite course of action when it approved development agreement that "establishe[d] the scope of the Project and precise parameters for future construction as well as a procedure to process Project approvals" and "aimed at assuring construction of the Project, provided certain contingencies are met"].) Similarly, in *City of Chula Vista v. County of San Diego* (1994) 23 Cal.App.4th 1713 [29 Cal.Rptr.2d 89], the court held that the county board of supervisors had "approved" a "project" within the meaning of CEQA when it approved an agreement authorizing its staff to negotiate and award a contract for operation of a hazardous waste transfer and treatment facility. (*City of Chula Vista, supra,* at pp. 1720–1721.) If simply authorizing the negotiation and award of a contract constitutes an "approval" under CEQA, a fortiori the City's passage of a resolution authorizing *execution* of an agreement already negotiated (the DDA) is also an "approval" within the meaning of CEQA. (Cf. *Concerned McCloud Citizens v. McCloud Community Services Dist.* (2007) 147 Cal.App.4th 181, 197 [54 Cal.Rptr.3d 1] [district's approval and execution of contingent water contract was not "approval" where contract itself was subject to further CEQA review and did not designate physical location or specifications of proposed project]; *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 964 [91 Cal.Rptr.2d 66] [project not "approved" for CEQA purposes where irrigation district's resolution merely authorized negotiations that might lead to purchase of project].)

### D. Citizens's Challenges to the DDA and the MND Are Untimely.

Having concluded that the city council's resolution approving execution of the DDA and adoption of the MND constituted "approval" of the "project" for CEQA purposes, it is clear that Citizens's challenges to the DDA and the adequacy of the environmental review culminating in the MND are untimely. Once the City approved the Alameda Theatre Project, it was required to file a notice of determination within five days. (§ 21152, subd. (a).) It did so.[10] Any action "alleging that a public agency has improperly determined whether a project may have a significant effect on the environment shall be commenced within 30 days from the date of the filing of the notice required by . . . subdivision (a) of Section 21152." (§ 21167, subd. (b).) Citizens did not file this action until October 3, 2005, some five months later. As a consequence, the trial court correctly held that Citizens's petition is not timely to challenge either the City's approval of the DDA or its adoption of the MND for the

---

[10] As the trial court noted in its statement of decision, "[t]here has been no challenge raised that the City did not provide proper notice of the Initial Study or of its intent to adopt a mitigated negative declaration for the Project at the May 3, 2005 hearing."

project. (See *STOP, supra,* 74 Cal.App.4th at p. 797, fn. 2; *Temecula Band of Luiseño Mission Indians v. Rancho Cal. Water Dist.* (1996) 43 Cal.App.4th 425, 430, fn. 3 [50 Cal.Rptr.2d 769] (*Temecula Band*).)

We note that Citizens has cited no case in which a court has permitted a challenge to either an EIR, a negative declaration, or an MND in circumstances similar to those here. Citizens relies heavily on *El Dorado Union High School Dist. v. City of Placerville* (1983) 144 Cal.App.3d 123 [192 Cal.Rptr. 480] (*El Dorado*) to argue that, because the City chose to file more than one notice of determination relating to this project, the statute of limitations under CEQA does not begin to run until the filing of the last notice of determination. Citizens reads too much into the *El Dorado* opinion. In *El Dorado,* the City of Placerville filed two notices of determination—the first approving the rezoning of the property at issue, and the second approving a subdivision map for the property. (144 Cal.App.3d, *supra,* at pp. 127–128.) The school district did not seek review of the rezoning that was the subject of the first notice of determination, but did challenge the subdivision map approval that was the subject of the second. (*Id.* at p. 129.) The defendants claimed that the school district's suit should be dismissed as untimely, arguing that the statute of limitations began to run when the first notice of determination was filed. (*Ibid.*) The court rejected the argument and held that the limitations period did not begin to run until the filing of the second notice of determination. (*Id.* at p. 130.) In doing so, however, it noted that "City elected to file two notices of determination. *There was no subdivision map pending for consideration by City when the rezoning was approved. . . .* [¶] City could have waited and filed one notice after approval of both the rezoning and the map. Its decision to file two notices, whether or not proper under CEQA, should not foreclose a challenge to the EIR *as it relates to the subdivision map, which was not before City when it filed the first notice.* If the public agency files more than one notice of determination, we perceive that CEQA permits suits challenging the agency's action filed within 30 days of the last notice." (*Ibid.,* italics added.)[11]

As the italicized language makes clear, the *El Dorado* court held only that the school district could not be precluded from challenging the decision that was the subject of the *second* notice of determination (the subdivision map approval) merely because the City of Placerville had filed an earlier notice of determination to announce a *different* decision (the rezoning). (*El Dorado, supra,* 144 Cal.App.3d at p. 130.) Indeed, the school district could not have challenged the subdivision map approval after the filing of the first notice of

---

[11] The court in *El Dorado* also noted that it appeared that the two "activities" at issue— rezoning and subdivision map approval—constituted two separate "projects" within the meaning of the Guidelines. (*El Dorado, supra,* 144 Cal.App.3d at pp. 129–130.)

determination because "[t]here was no subdivision map pending for consideration by City when the rezoning was approved." (*Ibid.*) Contrary to Citizens's reading of the case, the *El Dorado* court did not hold that an agency's filing of a second notice of determination permits a party to challenge the decision that was the subject of the first notice of determination after the 30-day limitations period for the earlier notice of determination has expired. Here, the fact that the City has filed notices of determination relating to subsequent approvals does not extend the limitations period for challenging the MND that was the subject of the May 4, 2005 notice of determination.

E. *The Case Is Governed by Section 21166 and the Applicable Standard of Review Is Substantial Evidence.*

■ Because the statute of limitations has expired for challenging the determinations that were the subject of the May 4, 2005 notice of determination, any challenges under CEQA to later approvals or to changes in the project are " 'limited to the legality of the agency's decision about whether to require a subsequent or supplemental EIR, or subsequent negative declaration, and the underlying EIR or negative declaration may not be attacked.' " (*Temecula Band, supra,* 43 Cal.App.4th at p. 437, quoting 2 Practice Under CEQA, *supra,* § 23.26, p. 942.) As the City correctly points out, this limitation applies even if the original MND was invalid or in some way defective. (*Temecula Band, supra,* at p. 430, fn. 3; see *County of Santa Clara v. Redevelopment Agency* (1993) 18 Cal.App.4th 1008, 1018 [22 Cal.Rptr.2d 868].)

After the statute of limitations has expired, the City's decision to adopt the MND "is protected by concerns for finality and presumptive correctness." (*STOP, supra,* 74 Cal.App.4th at p. 797; see § 21167.2.) Section 21166 thus "represents a shift in the applicable policy considerations. The low threshold for requiring the preparation of an EIR in the first instance is no longer applicable; instead, agencies are prohibited from requiring further environmental review unless the stated conditions are met." (*Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1017–1018 [100 Cal.Rptr.2d 413].) Whether these conditions are met is a determination that the City must make on the whole record, and we will uphold its determination on appeal if substantial evidence supports the City's decision. (Guidelines, § 15162, subd. (a) [lead agency's determination to prepare subsequent EIR to be made "on the basis of substantial evidence in the light of the whole record"]; *American Canyon Community United for Responsible Growth v. City of American Canyon* (2006) 145 Cal.App.4th 1062, 1072 [52 Cal.Rptr.3d 312]; *Friends of Davis, supra,* at p. 1019.)

### F. Our Holding Advances CEQA's Policy of Prompt Resolution of Challenges to Public Agencies' Decisions Concerning Land Use.

Before examining whether substantial evidence supports the City's decision, we address Citizens's suggestion that the approach adopted by the City in this case "def[ies] common sense and public policy." The opposite is true. One of the legislative policies animating CEQA is the prompt resolution of challenges to the decisions of public agencies regarding land use. (E.g., *Royalty Carpet Mills, Inc. v. City of Irvine* (2005) 125 Cal.App.4th 1110, 1121 [23 Cal.Rptr.3d 282].) "Allegations that the public agency failed in its duty to make an adequate environmental assessment must be expeditiously resolved, and CEQA contains a number of procedural provisions evidencing legislative intent that the public interest is not served unless CEQA challenges are promptly filed and diligently prosecuted." (*Nacimiento Regional Water Management Advisory Com. v. Monterey County Water Resources Agency* (2004) 122 Cal.App.4th 961, 965 [18 Cal.Rptr.3d 921]; accord, *Oceanside Marina Towers Assn. v. Oceanside Community Development Com.* (1986) 187 Cal.App.3d 735, 741 [231 Cal.Rptr. 910].) Such challenges, "with their obvious potential for financial prejudice and disruption, must not be permitted to drag on to the potential serious injury of the real party in interest." (*Board of Supervisors v. Superior Court* (1994) 23 Cal.App.4th 830, 837 [28 Cal.Rptr.2d 560].)

Accepting Citizens's argument that its challenge is timely would turn this policy on its head. Rather than encouraging resolution of challenges to an agency's environmental assessment at the earliest possible stage, as CEQA requires, Citizens's position would permit a party to wait until after a project was well under way and substantial resources had been invested before seeking review of an agency's environmental assessment of the project. This is plainly not what the statute contemplates. "CEQA [is] not to be 'subverted into an instrument for the oppression and delay of social, economic, or recreational development and advancement.'" (*Board of Supervisors v. Superior Court, supra,* 23 Cal.App.4th at p. 837, quoting *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 576 [276 Cal.Rptr. 410, 801 P.2d 1161].) The City's decision to conduct environmental review at an early stage of this project is fully consistent with the policies expressed in the statute.

### II. Citizens Has Failed to Demonstrate That the City's Actions Are Unsupported by Substantial Evidence.

Although Citizens has framed its argument principally in terms of the fair argument standard drawn from section 21151, it also contends that the evidence in the record supports the preparation of an EIR even under the

standards of section 21166.[12] Citizens claims that "[t]he bulk of evidence post-dates approval of the DDA and the filing of the first NOD in May 2005, and thus is new information that would trigger an EIR even as supplemental review." We take this to be an argument under section 21166, subdivision (c). As explained in the Guidelines, that subdivision will require preparation of a subsequent EIR if "[n]ew information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time . . . the negative declaration was adopted" demonstrates the existence of any of four enumerated conditions.[13] (Guidelines, § 15162, subd. (a)(3)(A)–(D).) The issue for us is whether there is substantial evidence to support the determination that there was no new information demonstrating that the Alameda Theatre Project will have significant environmental effects not previously discussed in the MND. (See *STOP, supra,* 74 Cal.App.4th at p. 798.) "In determining that issue, all reasonable doubts are resolved in favor of the [City's] decision." (*Ibid.*) We conclude that Citizens has failed to make the required showing.

To the extent that Citizens addresses section 21166, it contends that "there is no substantial evidence that the post-May administrative record does *not* contain significant new information regarding potentially significant impacts in the areas of historic resources,[14] aesthetics, and parking." (Original italics.) This contention is flawed, because it reverses the respective burdens of the parties. It is *Citizens'* burden to demonstrate that there is not sufficient evidence in the record to justify the City's action. (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 749 [39 Cal.Rptr.3d 189].) To do so, an appellant must set forth in its brief all the material evidence on

---

[12] Although Citizens brought its action for writ of mandamus as a challenge to the City's August 16 and November 1, 2005 approvals, Citizens does not specifically address these actions in its briefs, save to respond to the City's argument that Citizens failed to exhaust administrative remedies. Instead, Citizens argues more generally that an EIR is required. As a consequence, we will discuss only the argument actually briefed.

[13] The new information must show the existence of one of the following four conditions: "(A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration; [¶] (B) Significant effects previously examined will be substantially more severe than shown in the previous EIR; [¶] (C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or [¶] (D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative." (Guidelines, § 15162, subd. (a)(3)(A)–(D).)

[14] Under the Guidelines, "historical resources" include resources listed in the California Register of Historical Resources or determined to be eligible for such listing by the State Historical Resources Commission. (Guidelines, § 15064.5, subd. (a)(1).) Historical resources also include resources included in a local register of historical resources or identified as significant in a historical resource survey meeting the requirements of section 5024.1, subdivision (g). (Guidelines, § 15064.5, subd. (a)(2).)

the point, not merely its own evidence. (*Ibid.*) A failure to do so is deemed a concession that the evidence supports the findings. (*Markley v. City Council* (1982) 131 Cal.App.3d 656, 673 [182 Cal.Rptr. 659] (*Markley*).) The reason for this is that "if the appellants fail to present us with all the relevant evidence, then the appellants *cannot* carry their burden of showing the evidence was insufficient to support the agency's decision because support for that decision may lie in the evidence the appellants ignore." (*State Water Resources Control Bd. Cases, supra*, at pp. 749–750, orginial italics.) This failure to present all relevant evidence on the point "is fatal." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266 [15 Cal.Rptr.3d 176].) "A reviewing court will not independently review the record to make up for appellant's failure to carry his burden." (*Ibid.*)

Here, not only has Citizens failed to meet its obligation to discuss all the relevant evidence, Citizens also concedes in its brief that "the administrative record also includes evidence in support" of the Alameda Theatre Project. But Citizens's brief contains no recitation or discussion of the record evidence that supports the City's decision. As a consequence, we would be justified in dismissing its challenge out of hand. (*State Water Resources Control Bd. Cases, supra*, 136 Cal.App.4th at p. 750.) Nonetheless despite Citizens's omission and concession, we review the record evidence briefly and find that Citizens has failed to meet its burden under section 21166 and Guidelines section 15162, subdivision (a). (See *Markley, supra*, 131 Cal.App.3d at p. 673 [examining record despite appellant's failure to discuss all the relevant evidence].)

■ Citizens argues that information that was not available at the time the MND was prepared demonstrates the need for an EIR. Citizens refers specifically to a three-page report dated August 2005 that was prepared for Citizens by historian Woodruff Minor and to the "expert opinions of the [h]istorical [a]dvisory [b]oard from its public hearing of June 2005."[15] To prevail on this claim, Citizens must do more than demonstrate that this information is new. It must also show that the information is (1) of substantial importance and (2) was not known and *could not have been known with the exercise of reasonable diligence* at the time the negative declaration was adopted in May 2005. (Guidelines, § 15162, subd. (a).) Even if we assume that this information is of "substantial importance," Citizens does not meet its burden of establishing why Minor's report could not have been prepared earlier with the exercise of reasonable diligence. Nor does the report itself appear to contain anything that could not have been brought to the City's attention prior to the adoption of the MND. To the contrary, the report refers to the "architectural renderings and site plans for the proposed development,"

---

[15] In its original and supplemental petitions for writ of mandamus, the only allegedly new information Citizens identified was Minor's report. The petitions did not mention the opinions of the historical advisory board.

all of which were in existence prior to the adoption of the MND. The designs of both the cineplex and parking structure, to which the Minor report objects, were reviewed at the meeting of the historical advisory board on April 7, 2005. Further, the Minor report purports to offer a "dissenting opinion" to an analysis of aesthetics prepared in December 2004, publicly available, and submitted to the City in advance of the adoption of the MND. Citizens has not established why, with the exercise of reasonable diligence, the information in the Minor report could not have been known prior to the adoption of the MND. Thus the Minor report does not suffice to satisfy Citizens's burden under section 21166.

Citizens alludes to the transcript of the historical advisory board hearing held June 2, 2005, "as evidence of significant impacts to historic resources." Rather than analyzing the transcript, Citizens simply states that it contains "too many statements to individually cite here." Out of some 80 pages of transcript, Citizens identifies only two specific statements in which two historical advisory board members questioned the size and design of the cineplex structure. Again, Citizens does not attempt to show that any of this information could not have been discovered with reasonable diligence prior to the approval of the DDA and adoption of the MND. Thus, the historical advisory board transcript does not satisfy Citizens's burden of demonstrating that the City's determination not to reopen the CEQA process is unsupported by substantial evidence.

■ We conclude that Citizens has failed to carry its burden under section 21166 and Guidelines section 15162, subdivision (a)(3). We hold that there is substantial evidence to support the City's determination that there was no new information that would have required preparation of an EIR.[16] (See Guidelines, § 15162, subd. (a).)

III. *The City's Findings Were Adequate.*

■ Citizens argues, albeit in a cursory fashion, that the City's findings denying Citizens' administrative appeals and upholding the use and design approvals failed to support the City's refusal to prepare an EIR. Citizens contends that "the City was required to provide an analytic basis for its findings, supported by substantial evidence, and it fell far short." We disagree. As a leading treatise explains, "CEQA does *not* require that findings be adopted when an agency determines that a subsequent EIR is not required. An implied finding that a further EIR is not required under [Public Resources Code] § 21166 is sufficient as long as it is supported by substantial evidence."

---

[16] Because we conclude that Citizens's arguments fail on their merits, we need not resolve either the City's claim that Citizens failed to exhaust administrative remedies or the City's claim that Citizens's challenge to the August 16, 2005 design review approvals is moot. For this reason, we also deny the City's request for judicial notice, which relates solely to the City's mootness argument.

(1 Practice Under CEQA, *supra*, § 19.43, p. 922, italics added; see also *Benton, supra*, 226 Cal.App.3d at p. 1483 [county's denial of appeal requesting new EIR and its adoption of mitigated negative declaration "impliedly agreed" with conclusion that Guidelines, § 15162 factors were not present].) The City's findings were therefore adequate.

Disposition

The judgment is affirmed.

Jones, P. J., and Simons, J., concurred.

A petition for a rehearing was denied April 24, 2007, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 27, 2007, S152500.