Filed 6/17/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CITIZENS FOR A GREEN SAN MATEO,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SAN MATEO COUNTY COMMUNITY COLLEGE DISTRICT ET AL.,<br><br>    Defendants and Appellants. | A137612<br><br>(San Mateo County<br>Super. Ct. No. CIV 506800) |

In this action under the California Environmental Quality Act (Pub. Resources Code, §21000 et seq. (CEQA)),[1] San Mateo County Community College District and San Mateo County College District Board of Trustees (collectively District[2]) appeal from the judgment granting the petition for a writ of mandate brought by Citizens for a Green San Mateo (Citizens), challenging the District's approval of a mitigated negative declaration for the College of San Mateo (CSM) Facilities Improvement Project (the Project). The Project involves the renovation, demolition and/or new construction of numerous buildings, as well as renovation of parking lots, pedestrian walkways, and vehicle circulation. Citizens contends the District violated CEQA when it removed trees on the hillsides surrounding the CSM campus, alleging that the "clear-cutting" of more than 200

---

[1]    Unspecified section references refer to the Public Resources Code. Unspecified references to "Guidelines" are to the California Code of Regulations, title 14, section 15000 et seq. These guidelines " 'are entitled to great weight and should be respected by the courts unless they are clearly erroneous or unauthorized.' [Citation.]" (*Fall River Wild Trout Foundation v. County of Shasta* (1999) 70 Cal.App.4th 482, 490.)

[2]    Where appropriate, we shall differentiate between the District and the Board of Trustees (Board).

1

mature trees was outside the scope of the Project. The District argues, among other things, that Citizens' challenge is untimely. Finding Citizens' action is barred under the applicable statute of limitations, we reverse.

## I. BACKGROUND

The District, established in 1922, owns and operates three public community colleges in San Mateo County, including CSM, Skyline College, and Cañada College. The CSM campus is situated on 153 acres on a hilltop in the City of San Mateo, and is classified as "Urban and Built-Up Land" by the Department of Conservation. The City of Hillsborough is northwest of the CSM campus. No officially designated scenic vistas are on the CSM campus, and no designated scenic highways are nearby. CSM does, however, provide "panoramic views of the San Francisco Bay" from some areas of the campus.

### A. *The 2006 Facilities Master Plan*

In 1999, the District initiated a process to "identify needs for repair/renovation and new construction projects required to support the current and future instructional needs" of its three colleges. This process culminated in the 2001 Educational Facilities Master Plan. In August 2006, the District adopted the 2006 Facilities Master Plan to update the 2001 Educational Plan "as the guiding document for specific facility improvements" at the District's three campuses. With funding from the 2005 voter-approved Measure A, along with various state funds, the District sought to complete the proposed improvements set forth in the 2006 Facilities Master Plan. The recommended improvements for each college share the same planning guidelines, which have the goal of creating physical connections resulting in a cohesive campus concept. Specifically, the guidelines emphasize the ability of exterior spaces as contributing to the overall planning structure. "Their quality, character and prominence results from a concentration of external elements including people, landscape and enclosure." The guidelines also encourage the creation of gathering spaces and improved pedestrian and vehicular circulation. Landscape elements are suggested to create "visual cues to enhance the

2

perception and functions around the campus." Such landscape elements "might be hard or soft," "natural or constructed," and/or "big or small."

Among the specific recommendations for the CSM campus is the implementation of "a range of hierarchies of landscape elements as visual cues for understanding and navigating the campus." The recommended "landscape components," included "trees, furniture, lighting, signage, and surface treatments . . . ." With "the objectives of way-finding, managing the interface between pedestrian and vehicular circulation" the 2006 Facilities Master Plan "recommends improvements for all parking lots and the Loop Road." The Loop Road at CSM is "self-contained," in that no public traffic uses the Loop Road as a shortcut to other areas.

The 2006 Facilities Master Plan is attached as appendix A to the Initial Study and its recommendations are referenced and included as part of the Project's purpose.

**B.     *The Initial Study and Mitigated Negative Declaration***

In December 2006, an Initial Study was prepared for the CSM Project and formed the basis of the District's proposed mitigated negative declaration.

*1.     Project Background*

The Initial Study identifies the major goals of the Project as including "the renovation or replacement of old facilities, demolition of obsolete buildings, improved access to student support services, modernization of general lecture facilities, creation of more defined main entrances, improved parking accessibility, and renovation of outdoor spaces and athletic facilities." The Project's proposed improvements, which are based on the recommendations in the 2006 Facilities Master Plan, include "enhancement of the campus entries and pedestrian corridors, traffic circulation improvements, renovation of buildings and parking lots, building demolition, and construction of new buildings." The recommended improvements are designed to "enhance and improve the learning environments of each college and provide first-class facilities and grounds that stimulate and inspire the students."

*2.     Project Description*

The Project "includes several facility improvement projects, including: enhancement of the campus entrance, pedestrian corridors, and plazas; internal traffic circulation improvements; renovation of existing buildings; building demolition; construction of new and or replacement buildings; and renovation and construction of new parking lots." With respect to the internal traffic circulation, the Project suggests that the main Loop Road "could be repaved" and "*modified with landscape treatment*" to assist with vehicular crossings and pedestrian safety. (Italics added.)

The Project description includes a list of assumptions and design features regarding, among other things, the Project boundaries, tree removal, lighting and parking lot renovations. All proposed improvements are within campus boundaries on property owned by the District. With respect to tree removal, the Project assumptions and design features section specifically explains that: "Tree removal could occur [as] a result of building construction or demolition and would be compensated with the planting of replacement trees and vegetation around new or renovated buildings and parking lots, at campus entrances, at the proposed new roundabouts, and within the overall enhanced landscape design for the campus." Also, exterior lighting "would be focused onsite, generally directed downward, and incorporate shielding to prevent fugitive glare." Further, to the extent feasible, "luminaire mounts (e.g. light poles, wall fixtures, etc.) with non-glare finishes would be installed. The height of light standards would be reduced (to the extent practical) to limit the potential for light backscatter into the nighttime sky, as well as incidental light spillover. Luminaire intensity would be the minimum necessary for safety."

### 3. *Environmental Impacts*

The Initial Study analyzed the Project's potential environmental impacts and concluded that all potentially significant impacts could be avoided or reduced to a less-than-significant level with the implementation of various mitigation measures.

#### a. Aesthetics

In the aesthetics analysis, the Initial Study noted that there are "no officially designated scenic vistas." However, it was noted that the Project site has "important

4

scenic vistas . . . of the San Francisco Bay." As such, "[t]he design of the proposed project would take advantage of the prominent views to enhance the visual quality of the campus." Inasmuch as the proposed Project would not adversely affect the scenic qualities of the campus, the Initial Study concluded there would be no impact on scenic vistas.

With respect to the visual character of the Project site and surroundings, the aesthetics analysis noted that the Project "includes construction of new and/or replacement buildings and parking lots; renovation of existing buildings; demolition of obsolete buildings; and internal circulation and entrance improvements for the *purpose of visually and functionally improving* and modernizing the campus." (Italics added.) Thus, the Project "would change the aesthetic" of CSM, but would "not significantly change the overall visual massing or scale of development at the project site." Rather, "*[c]hanges to the visual character and to the local landform* would be site-specific and would not detract from the adjacent natural landscapes or panoramic views. *The proposed project could require the removal of mature trees and vegetation. Individual tree removal would be compensated by planting of replacement trees* and vegetation around new and renovated buildings and parking lots, at campus entrances, and *within the overall enhanced landscape design* for the campus." (Italics added.) The environmental impact was deemed to be less than significant, as the proposed improvements "would not result in the substantial degradation of the visual character and quality of the project site or its surroundings."

The aesthetics analysis also concluded that there would be a less than significant impact on lighting and glare issues at CSM.

b.      Biological Resources

In the biological resources analysis, the Initial Study notes it is "possible that the removal of trees and shrubs and demolition of existing structures could result in the loss of migratory bird nests." To mitigate these potential impacts, the Initial Study incorporated "Mitigation Measure Bio-1," which states that tree removal and structure demolition "shall take place outside the migratory bird nesting season." The Initial Study

5

concluded that the impacts on sensitive species would be reduced to less than significant with mitigation.

In discussing whether the Project would conflict with any tree preservation policies or ordinances, the Initial Study notes that the Project "would result in the *removal and pruning of an unknown number of trees.* Some of these trees may qualify as heritage trees under the City of San Mateo's Heritage Tree Ordinance."[3] The Initial Study further reported: "The District is not required to comply with this ordinance; however, they would avoid removing or heavily pruning heritage trees when feasible. Tree plantings that are already proposed as part of the project would mitigate tree removals that are unavoidable. Consequently, this impact would be less than significant. No mitigation is required."

### 4. Public Hearing

On December 19, 2006, the District published a Notice of Intent (NOI) to adopt the Initial Study and Mitigated Negative Declaration for the Project. The NOI stated that the public review period was from December 20, 2006 to January 9, 2007, with the public hearing for this Project taking place on January 24, 2007. The NOI further advised that a copy of the Initial Study and Mitigated Negative Declaration, along with the referenced documents, were available for review at the District and at CSM. During the public review period, no one from Citizens commented on the Initial Study and Mitigated Negative Declaration. At the January 24, 2007 public hearing, Trustee Mandelkern expressed concern that the District was not required to comply with the Heritage Tree Ordinance, but noted "the number of newly planted trees will be greater than that of removed trees." When the Board "opened the Public Hearing and asked if there were questions or comments from the audience," no one challenged the adequacy of the Initial Study and Mitigated Negative Declaration. At the close of the hearing, the Board voted

---

[3] The Initial Study defines heritage trees as follows: 1) "Any tree native to, or adapted to, climatic conditions of the area (e.g. Oak, Bay, Redwood, Cedar, Buckeye), having a trunk diameter of ten inches measured at four feet above the ground;" or 2) "Any tree with a trunk diameter of sixteen inches or more measured at four feet above ground level[.]"

6

unanimously to adopt the Initial Study and Mitigated Negative Declaration. Thereafter, on February 15, 2007, the District filed a notice of determination (NOD) for the Project and filed the Initial Study and Mitigated Negative Declaration (hereafter IS/MND) with the San Mateo County Clerk.

## C.    *CSM's North Gateway Project Chronology*

The IS/MND disclosed that "individual projects that make up the [CSM] [P]roject would occur . . . within the timeframe of January 1, 2007 to January 15, 2012." The numerous individual projects disclosed and studied in the IS/MND included various plans for the northern part of the CSM campus, including demolition of Buildings 21 through 29, renovation and expansion of Parking Lots 9, 10, and 11, and associated lighting, circulation improvements and landscaping changes including tree removal. These improvements later became known as the "North Gateway Project."

### 1.    *Initial Design*

At a June 2008 project meeting regarding the proposed improvements in the North Gateway, several attendees discussed the surrounding tree coverage; this meeting was not open to the public. CSM President Mike Claire raised the issue of having a "[h]aunted forest vs. enchanted forest." And, he suggested that they "[t]rim/thin [t]rees to frame views." While District Chancellor Ron Galatolo, commented that the attendees should "[t]hink about removing trees that are not 'appropriate' (digger pines, eucalyptus)." District Executive Director of Construction Planning Linda da Silva noted that the "Fire Department wants to see fire hazard reduced." Whereas District Vice Chancellor Jose Nunez opined the project should "[b]alance shade trees with views [and] [b]e cautious with root structure." Finally, another attendee, Kevin Sullivan, noted that they should "[o]nly leave trees that are healthy and frame views."

Later that same month, in a public board report dated June 25, 2008, the District described and reported on the status of two related components of the CSM Project—the CIP2 Design-Build Project and the North Gateway Project. The CIP2 Design Build Project was described as a "multi-component project," involving the demolition of Buildings 5, 6, 10, 11, and 13, and subsequent replacement of Buildings 5 and 10. This

7

project was also to include "major improvements to the exterior areas of the campus." It was further noted that "*CSM's campus exterior will be revamped to take advantage of its idyllic hilltop location.*" (Italics added.) Additionally, "[l]andscape improvements will create hierarchies to define vehicular and accessible pedestrian circulation routes and manage pedestrian/vehicular interface." The North Gateway Project was to include seismic and electrical hazard abatement activities, including the demolition of Buildings 21 to 29, as well as the repair and reconfiguration of the site with accessible pathways, recreation of parking lots 9 and 10, along with "*refreshed landscaping and a performance/gathering venue in collaboration with the Design-Build Project.*" (Italics added.) Additionally, "load center #4" of the site's main electrical distribution system would be replaced and the "creation of new load center #8" would "allow the contractors to safe off [*sic*] of the electrical system prior to the demolition of the buildings." The District anticipated a two-phase project with the creation of load center 8 planned for spring 2009 and demolition beginning in spring 2010.

At a September 2, 2008 meeting regarding the North Gateway Project, the District "directed changes" to the current design, seeking, among other things, to "[e]liminate all trees in the field of parking–Lots, 9, 10, and 11[,]" and to "[e]liminate the perimeter trees at Lot 10." This meeting was not open to the public.

In March 2009, the public was notified about the changes to the North Gateway portion of the CSM Project. Specifically, the agenda for the March 25, 2009 public hearing included an item regarding the "Authorization to Augment the Design Build Contract for [CSM] CIP2 Design Build Project." The corresponding board report noted that the District had approved various "contract change orders only after confirming that each was fair, reasonable, within the project budget, and would bring value to the project[.]" Among the approved changes were "[s]afety and security upgrades such as additional parking lot, roadway and walkway lighting; and *greatly increased amounts of tree trimming as requested by the local fire authorities* and required to ensure woodland health in the coming decades." (Italics added.)

8

In a subsequent board report dated June 24, 2009, the District reported that once construction funding became available, bidding and construction would begin. Construction of load center 8 would start immediately after bid award.

2.      *Request for Bids and Project Manual*

On September 9 and 16, 2010, the District published newspaper notices notifying interested members of the public that the District was seeking to award a contract to complete the "North Gateway Project Phase I: Load Center 8 & Site Wall" portion of the CSM Project. The work was described as "construction of a new structure to house Load Center 8, medium voltage electrical work related to Load Centers 4 and 8, and construction of a hillside retaining site wall, *tree removal and pruning*." (Italics added.) The notice referenced that bid documents were available through the District's Web site, the link to which was posted in the notice. The notice also advised that the bid documents were available at seven "Bay Area plan rooms," the names and telephone numbers for these sites were also provided.

Among the bid documents was the "Project Manual," which had been prepared in May 2010, and subsequently amended in July 2010, and October 2010. The Project Manual is a comprehensive guide, containing lengthy contracts and bid specifications. The Project Manual, at section 01 10 00, contains a summary of the work to be performed, which is described as the "decommissioning and demolition of Load Center #4 adjacent to CSM Building 36, and existing transformer and switch gear at the East entrance to Building 18, installation of new Load Center #8, transformer, and switch gear in a new enclosure north of Building 18, and installation of concrete site wall at the East Perimeter Road, located at [CSM]. The [w]ork *also comprises tree trimming and/or removals*." (Italics added.) The Project Manual, at section 01 35 00, also sets forth "Special Procedures," which are designed to apprise potential bidders about the project's environmental impacts and the required mitigation measures. This section commences with the following summary: "In compliance with CEQA requirements, the District conducted an Initial Study to ascertain whether the project might have a significant effect on the environment. The Initial Study identified potentially significant impacts on the

9

environment.  However, all potential impacts of the proposed project can be avoided or reduced to a less-than-significant level with implementation of the following mitigation measures.  Contractor shall conform with the following mitigation measures."  Among the enumerated mitigation measures was adherence to a "Tree Protection Plan."  Pursuant to the Tree Protection Plan, "[w]here construction is to be performed in the vicinity of trees and shrubbery, the [w]ork shall be carried on in a manner that will cause minimum damage.  *District will designate trees that are to be removed.*"  (Italics added.)

In the July 2010 Addendum, the Project Manual, at section 31 1300-1, disclosed the extent of the "Tree Protection & Trimming" related to the project.  This section "includes the protection and trimming, or removal of existing trees and shrubs that are within limits of the work, interfere with, or are affected by, execution of the [w]ork, whether temporary or permanent construction."  Specific tree pruning and removal recommendations are further described in the "Tree Pruning and Removal Schedule."  This schedule explains that " [t]rees to be removed or pruned *outside the 'Loop Road'* are tagged and numbered in the field to correspond to the tree numbers in the table below."  (Italics added.)  The tagged trees were identified in the accompanying table, by tag number and species.  The table also identified whether removal or pruning was required and the number of trees affected.

The October 2010 Addendum to the Project Manual indicates that additional trees were tagged on October 11, 2010, for pruning or removal.

3.      *Award of Contract*

The District posted a Notice of Intent to Award a contract for North Gateway Phase I on October 26, 2010, and scheduled a public meeting of the Board for November 17, 2010.  The agenda for the November 17, 2010 meeting listed the contract award for North Gateway Phase I.  The board report, which was distributed prior to the November 17, 2010 meeting, explained that the North Gateway I contract included various kinds of electrical work and "tree work at the North Perimeter Road [a.k.a. Loop Road] as directed by the local Fire Marshall."  During the public hearing, no member of the public offered any comments addressing the contract.  The Board unanimously

10

approved the contract award as recommended in the board report.  On December 1, 2010, the District released a Notice of Award of the contract to Robert A. Bothman, Inc., for the first phase of the North Gateway work.

**D.**     ***Commencement of Work on North Gateway (Phase I)***

On December 27, 2010, subcontractor Atlas Tree Service, working under general contractor Robert A. Bothman, Inc., unloaded two bobcats, a grinder, and a dump truck on the CSM site in preparation for tree removal.  On December 28, 2010, Atlas Tree Service removed trees on the West Perimeter Road near Parking Lot 6A.  Atlas Tree Service continued to remove trees along Perimeter Road on December 29 and 30, 2010.  The tree removal and pruning work continued on January 3, 2011, and proceeded through January 14, 2011.

On January 5, 2011, a Citizens' member contacted the District expressing concern over the ongoing tree removal and pruning activities in the North Gateway area.

**E.**     ***Instant Litigation***

On July 1, 2011, Citizens filed a petition for writ of mandate, challenging the District's pruning and removal of trees conducted as part of North Gateway Phase I.  The District demurred on the grounds that the petition was untimely; the trial court overruled the District's demurrer.  Following briefing and a hearing on the merits, the trial court granted the petition.  Judgment was entered in January 2013.

Thereafter, the District filed a petition for supersedeas with this Court in January 2013.  We denied the petition, directing the District to return to the trial court and request a stay of the writ on appeal.  The District filed a stay request in the trial court in March 2013, which was denied following briefing and a hearing.

In April 2013, the District filed a second supersedeas petition with this Court.  We granted the petition with the proviso that the writ did not moot the appeal and that full project mitigation remained available.

## II. DISCUSSION

**A.**     ***CEQA Overview and Standard of Review***

CEQA is designed "to protect and maintain California's environmental quality." (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 106 [fn. omitted].) That said, " ' "[t]he purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations." ' [Citations.] We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements." ' [Citation.]" (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 924.)

"Generally under CEQA, if there is a possibility that a project may have a significant environmental effect, the responsible agency must do an initial study. [Citation.]" (*El Dorado County Taxpayers for Quality Growth v. County of El Dorado* (2004) 122 Cal.App.4th 1591, 1596 (*El Dorado*).) "If the initial study reveals that the project 'may' have a significant environmental effect (i.e., a reasonable possibility of such an effect), an [environmental impact report (EIR)] must be prepared; if there is no substantial evidence of such an effect, a negative declaration is sufficient. [Citations.]" (*Id.* at pp. 1596-1597; Guidelines, § 15063, subd. (b)(2).) "[I]f the project has potentially significant environmental effects but these effects will be reduced to insignificance by mitigation measures that the project's proponent has agreed to undertake, CEQA requires the . . . agency to prepare a mitigated negative declaration." (*Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041, 1048, citing § 21080, subd. (c)(2) and Guidelines, § 15064, subd. (f)(2).) In the instant case, the District did an initial study and prepared a mitigated negative declaration.

" 'In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' ([] § 21168.5.) Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' ([]§ 21168.5; see *Western States Petroleum*

12

*Assn. v. Superior Court* [(1995)] 9 Cal.4th [559,] 568; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392-393 (*Laurel Heights I*).)" (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 210-211 (*Clover Valley*).) " 'Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564), we accord greater deference to the agency's substantive factual conclusions.' " (*Clover Valley, supra,* 197 Cal.App.4th at p. 211.)

" 'An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision.' . . . (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427, fn. omitted (*Vineyard Area Citizens*).)" (*Clover Valley, supra,* 197 Cal.App.4th at p. 211.)

## B. *Statute of Limitations*

Statutes of limitations are designed "to prevent stale claims, give stability to transactions, protect settled expectations, promote diligence, encourage the prompt enforcement of substantive law, and reduce the volume of litigation. (E.g., *Marin Healthcare Dist. v. Sutter Health* (2002) 103 Cal.App.4th 861, 872; see *Hebrew Academy of San Francisco v. Goldman* (2007) 42 Cal.4th 883, 894; *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 395; *Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 787.) A statute of limitations ' "necessarily fix[es]" a "definite period[ ] of time" [citation], and hence operates conclusively across-the-board. It does so with respect to *all* causes of action, both those that do not have merit and also those that do. [Citation.] That it may bar meritorious causes of action as well as unmeritorious ones is the "price of the orderly and timely processing of litigation" [citation]—a price that may be high, but one that must nevertheless be paid.' (*Norgart, supra,* at p. 410, fn. omitted; see generally *Chase Securities Corp. v. Donaldson* (1945) 325 U.S. 304, 314, [operation of statute of

13

limitations 'does not discriminate between the just and the unjust claim'].)" (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 499 (*Stockton Citizens*.)

"For purposes of the CEQA statutes of limitation, the question is not the substance of the agency's decision, but whether the public was notified of that decision." (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 51 (*Committee for Green Foothills*.) "To ensure finality and predictability in public land use planning decisions, statutes of limitations governing challenges to such decisions are typically short. (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 27; see also, e.g., *Travis v. County of Santa Cruz* (2004) 33 Cal.4th 757, 774-775.) The limitations periods set forth in CEQA adhere to this pattern; indeed, as the CEQA Guidelines themselves assert, 'CEQA provides *unusually short* statutes of limitations on filing court challenges to the approval of projects under the act.' ([]Guidelines, § 15112, subd. (a), italics added.) As the CEQA Guidelines further explain, '[t]he statute of limitations periods are not public review periods or waiting periods for the person whose project has been approved. The project sponsor may proceed to carry out the project as soon as the necessary permits have been granted. The statute of limitations cuts off the right of another person to file a court action challenging approval of the project after the specified time period has expired.' ([] Guidelines, § 15112, subd. (b).)" (*Stockton Citizens, supra*, 48 Cal.4th at p. 499.)

"CEQA's purpose to ensure extremely prompt resolution of lawsuits claiming noncompliance with the Act is evidenced throughout the statute's procedural scheme. Such suits have calendar preference; more populous counties must designate one or more judges to develop CEQA expertise so as to permit prompt disposition of CEQA claims; and expedited briefing and hearing schedules are required. (§§ 21167.1, 21167.4.)

"Courts have often noted the Legislature's clear determination that " 'the public interest is not served unless CEQA challenges are promptly filed and diligently prosecuted." ' (*Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 111; ([*Citizens for a Megaplex-Free Alameda*]); see *Nacimiento*

14

*Regional Water Management Advisory Com. v. Monterey County Water Resources Agency* (2004) 122 Cal.App.4th 961, 965; accord, *Board of Supervisors v. Superior Court* (1994) 23 Cal.App.4th 830, 836; *Oceanside Marina Towers Assn. v. Oceanside Community Development Com.* (1986) 187 Cal.App.3d 735, 741, (*Oceanside Marina Towers*).) 'Patently, there is legislative concern that CEQA challenges, with their obvious potential for financial prejudice and disruption, must not be permitted to drag on to the potential serious injury of the real party in interest.' (*Board of Supervisors, supra,* at p. 837.) 'The Legislature has obviously structured the legal process for a CEQA challenge to be speedy, so as to prevent it from degenerating into a guerilla war of attrition by which project opponents wear out project proponents.' (*County of Orange v. Superior Court* (2003) 113 Cal.App.4th 1, 12, italics omitted.)" (*Stockton Citizens, supra,* 48 Cal.4th at p. 500.)

Section 21167[4] establishes statutes of limitation for all actions and proceedings alleging violations of CEQA. (*Committee for Green Foothills, supra,* 48 Cal.4th at

---

[4] Section 21167 states, in relevant part: "An action or proceeding to attack, review, set aside, void, or annul the following acts or decisions of a public agency on the grounds of noncompliance with this division shall be commenced as follows:

"(a) An action or proceeding alleging that a public agency is carrying out or has approved a project that may have a significant effect on the environment without having determined whether the project may have a significant effect on the environment shall be commenced within 180 days from the date of the public agency's decision to carry out or approve the project, or, if a project is undertaken without a formal decision by the public agency, within 180 days from the date of commencement of the project.

"(b) An action or proceeding alleging that a public agency has improperly determined whether a project may have a significant effect on the environment shall be commenced within 30 days from the date of the filing of the notice required by subdivision (a) of Section 21108 or subdivision (a) of Section 21152.

"(c) An action or proceeding alleging that an environmental impact report does not comply with this division shall be commenced within 30 days from the date of the filing of the notice required by subdivision (a) of Section 21108 or subdivision (a) of Section 21152 by the lead agency.

"(d) An action or proceeding alleging that a public agency has improperly determined that a project is not subject to this division pursuant to subdivision (b) of Section 21080 or Section 21172 shall be commenced within 35 days from the date of the filing by the public agency, or person specified in subdivision (b) or (c) of Section 21065, of the

p. 43.)  "CEQA reserves its very shortest limitations periods for cases where the agency has given public notice, in a form required or permitted by the statute, of an agency act or decision that is relevant to CEQA's statutory scheme.  Thus, where the agency approves a project without determining whether it will have a significant effect on the environment (and therefore presumably filing no CEQA notice), the limitations period is 180 days from project approval or, if there was no formal approval, 180 days from the commencement of construction.  (§ 21167, subd. (a).)  On the other hand, an action asserting that the agency has improperly determined whether a project subject to CEQA will have a significant environmental effect must be commenced within 30 days after the agency files the required notice of project approval (which notice must indicate the agency's determination about the project's effect on the environment).  (§§ 21108, subd. (a), 21152, subd. (a), 21167, subd. (b).)  A suit claiming that an EIR prepared for the project, or any other act or omission by the agency, does not comply with CEQA must be filed within 30 days after the above described notice of project approval is filed.  (§ 21167, subds. (c), (e).)"  (*Stockton Citizens, supra,* 48 Cal.4th at p. 500.)

Here, we must decide whether, as the District contends, Citizens' petition is barred under both the 30-day and 180-day limitations period.  "Which subdivision of section 21167 applies depends upon the nature of the CEQA violation alleged. 'In substance, subdivision (a) pertains to an action charging the public agency with approving or undertaking a project having a significant effect on the environment without any attempt to comply with CEQA, subdivision (b) pertains to an action alleging that the public

---

notice authorized by subdivision (b) of Section 21108 or subdivision (b) of Section 21152. If the notice has not been filed, the action or proceeding shall be commenced within 180 days from the date of the public agency's decision to carry out or approve the project, or, if a project is undertaken without a formal decision by the public agency, within 180 days from the date of commencement of the project.
"(e) An action or proceeding alleging that another act or omission of a public agency does not comply with this division shall be commenced within 30 days from the date of the filing of the notice required by subdivision (a) of Section 21108 or subdivision (a) of Section 21152."

agency has improperly determined that the project does not have a significant effect on the environment, subdivision (c) pertains to an action alleging that the EIR fails to comply with the requirements of CEQA, subdivision (d) pertains to an action charging that the public agency has improperly determined that the project is exempt from CEQA, and subdivision (e) is a catchall provision governing an action based on any other failure of the public agency to comply with CEQA.' [Citation.] A section 21167, subdivision (a) challenge alleges that an agency approved a project without determining its potential environmental impact. Obviously, the time for filing a subdivision (a) claim is not triggered by an NOD, because the allegation is that no determination was ever made. For all other claims, however, subdivisions (b) through (e) link the start of the limitations period to the filing of a notice of determination or exemption." (*Committee for Green Foothills, supra,*48 Cal.4th at p. 44, fn. omitted.)

This case does not challenge the initial approval of a project. The District approved the CSM Project more than four years before Citizens filed suit. Citizens have instead challenged the tree removal that was undertaken as part of the IS/MND for the CSM Project. Because the instant case does not involve an EIR, subdivision (c) of section 21167 does not apply. Nor are we concerned with subdivision (d), because this case does not concern an activity claimed to be exempt from CEQA. Here, the District alleges that the 30-day statute of either subdivision (b) or (e) applies because the District filed an NOD. Citizens maintains that the tree removal was not contemplated by the IS/MND and, as such, the NOD could not and did not trigger the 30-day statute. In the trial court, Citizens claimed, and the trial court agreed, that the notice necessary to trigger the statute of limitations was lacking here because the tree removal undertaken by the District was "materially different" than the project approved by the Board in November 2010 and contemplated by the NOD and IS/MND filed in 2007. According to Citizens, it was the actual observance of the tree removal in January 2011 that started the 180-day statute. The District counters that even if the 180-day statute of limitations of subdivision (a) applies, Citizens' action is still untimely. For a number of reasons, we agree with the District.

## C.    30-Day Limitations Period

The "plain language of section 21167 makes the filing of a notice of determination [NOD] of paramount importance for determining which statute of limitations applies to a CEQA claim.  If a valid NOD has been filed (§§ 21108, subd. (a), 21152, subd. (a)), *any* challenge to that decision under CEQA must be brought within 30 days, regardless of the nature of the alleged violation."  (*Committee for Green Foothills, supra,* 48 Cal.4th  at pp. 47-48.)

Here because the District filed an NOD concerning its approval of the CSM Project, any challenge to this approval had to be brought within 30 days.  (See *Committee for Green Foothills, supra,* 48 Cal.4th at p. 51.)  Citizens, however, argue that the 180-day statute of limitations should apply because the "ridgeline tree-cutting project" was not described in the IS/MND and, as such, the NOD "is ineffective as to that project." (Italics omitted.)  Below, Citizens claimed, and the trial court agreed, that the tree removal undertaken by the District was "materially different" than the project discussed in the IS/MND and NOD.

A " 'project' " under CEQA is defined as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] . . . [¶] (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."  (§ 21065.) According to the Guidelines, a " 'project' " refers to the activity that is being approved, which may include multiple discretionary approvals by governmental agencies. (Guidelines, § 15378, subd. (c).)  "The term 'project' does not mean each separate governmental approval."  (*Ibid.*)  " 'This definition ensures that the action reviewed under CEQA is not the approval itself but the development or other activities that will result from the approval.' [Citation.]"  (*Megaplex–Free Alameda, supra,* 149 Cal.App.4th at p. 106.)

18

Here, the IS specifically stated that the Project "would result in the *removal and pruning of an unknown number of trees.*" (Italics added.) Citizens argued, and the trial court agreed, that the references to tree removal were limited to those actions that "were necessary to the building or parking lot actions, not to other areas of the campus or the campus as a whole." The record, however, belies such a narrow interpretation of the contemplated tree removal. The 2006 Facilities Master Plan, upon which the Project's design elements were based, reflects the goal of visually enhancing exterior spaces through a range of landscape elements, including trees. Consistent with this purpose, the IS, in the aesthetics analysis, states that "[t]he design of the proposed project would take advantage of the prominent views to enhance the visual quality of the campus." As such, the IS notes that the Project "would change the aesthetic" of CSM, but explains as follows: "Changes to the visual character and to the local landform would be site-specific and would not detract from the adjacent natural landscapes or panoramic views. *The proposed project could require the removal of mature trees and vegetation. Individual tree removal would be compensated by planting of replacement trees* and vegetation around new and renovated buildings and parking lots, at campus entrances, and *within the overall enhanced landscape design* for the campus." (Italics added.)

Moreover, improvements to the campus Loop Road were contemplated in the 2006 Facilities Master Plan and in the IS itself. The Project description, in discussing the internal traffic circulation, suggests that the main Loop Road "could be repaved" and "modified with landscape treatment" to assist with vehicular crossings and pedestrian safety.

Citizens, citing *Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929 (*Concerned Citizens*), insist that the "tree removal" project was materially different from the project contemplated in the IS/MND and NOD. We disagree. Contrary to Citizens' contention, the tree removal was not an independent project. Rather, the record demonstrates that tree removal constituted a subsequent activity encompassed within the original CSM Project. (See, e.g., *Committee for Green Foothills, supra,* 48 Cal.4th at p. 44 [finding trails agreement not separate agreement but

19

subsequent activity encompassed in original project].) Moreover, the instant case is distinguishable from *Concerned Citizens, supra,* 42 Cal.3d 929. *Concerned Citizens* involved a challenge to a fairground theater started seven years after the project was approved. (42 Cal.3d at pp. 933-935, 939.) Our Supreme Court construed section 21167 as not barring the challenge, reasoning that there was no notice until the challengers knew or had reason to know that the project as it was being constructed was materially different than the one approved. (*Id.* at p. 939.) As approved the theater would have seated 5,000 on six acres, but as being constructed it would seat 7,000 on a site expanded to 10 acres. (*Id.* at p. 934.) The situation here is different because the IS itself provided Citizens notice that the Project would require tree removal. While it is true that the IS/MND and the NOD do not specifically refer to tree removal along the Loop Road, the references to the removal of an "unknown number" of trees, together with the goal of visually enhancing the campus through a variety of "landscape hierarchies," arguably put the public on notice that trees could be removed anywhere on campus, including along the Loop Road. Citizens' argument that a longer limitations period should apply because the District allegedly approved the tree-removal without conducting any environmental review "turns the notice-based system of section 21167 on its head." (*Committee for Green Foothills, supra,* 48 Cal.4th at p. 51.)

"A similar argument was rejected decades ago in *California Manufacturers Assn. v. Industrial Welfare Com.* (1980) 109 Cal.App.3d 95, 124-125. There, an association argued that the 30-day statutes of limitation in section 21167, subdivisions (b) and (e) apply only if the agency has undertaken an environmental investigation and filed a valid notice of determination and negative declaration. (*California Manufacturers,* at pp. 124–125.) The Court of Appeal disagreed, noting this assertion 'flies in the face of the clear language of the statutes which provide that they apply in (b), where it is alleged that the agency has "improperly determined" whether there will be a significant impact and in (e), where it is alleged that agency action or omission "does not comply" with statutory requirements.' (*California Manufacturers,* at p. 125.)" (*Committee for Green Foothills, supra,* 48 Cal.4th at p. 51.)

20

The California Supreme Court in *Committee for Green Foothills, supra,* 48 Cal.4th 32, agreeing with the analysis in *California Manufacturers,* noted that "[f]or purposes of the CEQA statutes of limitation, the question is not the substance of the agency's decision, but whether the public was notified of that decision." (*Committee for Green Foothills, supra,* 48 Cal.4th at p. 51.) In *Committee for Green Foothills,* a group argued that a subsequent development agreement constituted a new "project" and the responsible agency approved this project without determining its environmental effects. (*Committee for Green Foothills, supra,* 48 Cal.4th at p. 45.) According to the group, these allegations brought the case within the ambit of the 180-day statute of limitations. (*Ibid.*) Rejecting this argument, the Supreme Court held that the development agreement was not a CEQA project being considered for initial approval. (*Id.* at p. 52.) Rather, the court explained that the development agreement was a subsequent activity encompassed within the original project. (*Id.* at pp. 43, 52.)

So, too, here, Citizens cannot avail itself of the 180-day statute of limitations in section 21167, subdivision (a). "Subdivision (a) addresses claims that an agency has ignored CEQA and made no attempt to satisfy its requirements. When a NOD has been filed, the agency has at a minimum acknowledged CEQA and attempted compliance. In these situations, the Legislature has limited the time for filing suit to 30 days." (*Committee for Green Foothills, supra,* 48 Cal.4th at p. 51.) Because Citizens brought this challenge more than 30 days after the District approved the IS/MND and issued the NOD, the action is clearly time-barred under section 21667, subdivisions (b) and (e).

As we shall explain below, even if the 180-day statute of limitations period applied, the action is also time-barred under section 21167, subdivision (a).

### D.    *180-Day Limitations Period*

Assuming arguendo that the District failed to adequately notify the public of the tree cutting activities, any action challenging such activities was required to "be commenced within 180 days from the date of the [District's] decision to carry out or approve the project . . . ." (§ 21167, subd. (a).)

21

"The limitations period starts running on the date the project is approved by the public agency and is not retriggered on each subsequent date that the public agency takes some action toward implementing the project. (*Citizens for a Megaplex-Free Alameda [,supra,]* 149 Cal.App.4th [at pp.] 105-106 . . .; see Guidelines, § 15378, subd. (c).)" (*Van De Kamps Coalition v. Board of Trustees of Los Angeles Community College Dist.* (2012) 206 Cal.App.4th 1036, 1045 (*Van De Kamps*).) " ' "[A]pproval" means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person. The exact date of approval of any project is a matter determined by each public agency according to its rules, regulations, and ordinances. Legislative action in regard to a project often constitutes approval.' (Guidelines, § 15352, subd. (a).) In *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 134, (*Save Tara*), the California Supreme Court confirmed that a project may be approved for the purpose of CEQA 'even though further discretionary governmental decisions would be needed before any environmental change could occur.' There, the court rejected the argument that approval of a private project for CEQA purposes was limited to an unconditional agreement by the agency which irrevocably vested development rights, reasoning that '[s]uch a rule would be inconsistent with the [] Guidelines' definition of approval as the agency's "*earliest* commitment" to the project. [Citation.] Just as CEQA itself requires environmental review before a project's approval, not necessarily its *final* approval [citations], so the guideline defines "approval" as occurring when the agency *first* exercises its discretion to execute a contract or grant financial assistance, not when the *last* such discretionary decision is made.' [*Ibid.*] The *Save Tara* court emphasized that the policies behind CEQA are served by early environmental review. ([*Id.*] at p. 136 ['the agency's reservation of CEQA review until a later, final approval stage is unlikely to convince public observers that before committing itself to the project the agency fully considered the project's environmental consequences'].)" (*Van De Kamps Coalition, supra,* 206 Cal.App.4th at pp. 1046-1047.)

Here, the District's earliest commitment to the North Gateway Phase I project occurred at the November 17, 2010 public meeting, where the contract for the North

Gateway improvements was approved. Prior to approval of the contract, the District sought public bids by publishing a notice in the local newspaper on September 9 and 16, 2010, regarding the North Gateway Phase I work. The notice described the work as including "construction of a new structure to house Load Center 8 . . . and construction of a hillside retaining site wall, *tree removal and pruning*." (Italics added.) The notice also included a link to the project Web site, which identified the need for and benefits of the proposed tree removal, and directed interested parties to a Web site where additional project documents could be downloaded In addition to the Web site link, the notice listed the name and telephone numbers of seven physical locations where the bid documents could be obtained.

Among the bid documents was the Project Manual. The Project Manual detailed the work to be performed and the requirements of the project up for contract bid. This manual provided a summary of "work covered by contract documents," which included "tree trimming and/or removals." The Project Manual also indicated the contract would be subject to special procedures because "[i]n compliance with CEQA requirements, the District conducted an Initial Study [the 2007 IS/MND] to ascertain whether the project might have a significant effect on the environment." This section of the Project Manual required the chosen contractor to conform to mitigation measures and CSM Project design features, which are reflected in the Project Manual's "Tree Protection Plan." The Project Manual's June 2010 Addendum also listed every tree that was to be removed.

Prior to the November 17, 2010 public meeting, the District, as required by the Brown Act (Gov. Code, § 54950 et seq.), made the agenda packet available to the public.[5]

---

[5] Pursuant to the Brown Act, "agendas of public meetings and any other writings, when distributed to all, or a majority of all, of the members of a legislative body of a local agency by any person in connection with a matter subject to discussion or consideration at an open meeting of the body, are disclosable public records under the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1), and shall be made available upon request without delay." (Gov. Code, § 54957.5, subd. (a).) Further, "[i]f a writing that is a public record under subdivision (a), and that relates to an agenda item for an open session of a regular meeting of the legislative body of a local

The board report, which was included in the agenda packet, specifically referenced the contract up for bid included "tree work at the North Perimeter Road [a.k.a. Loop Road] as directed by the local Fire Marshall." During the public hearing, no member of the public offered any comments addressing the contract. The Board unanimously approved the contract award as recommended in the board report.

The District's actions at the November 17, 2010 meeting constituted approval of the North Gateway Phase I project triggering the 180-day limitations period in section 21167, subdivision (a), which means that Citizens' July 1, 2011 petition was untimely. See *Megaplex–Free Alameda, supra,* 149 Cal.App.4th at pp. 105-106, [city's resolution authorizing approval of disposition and development agreement was project approval for statute of limitations purposes, even though agreement was subject to various discretionary approvals]; *City of Chula Vista v. County of San Diego* (1994) 23 Cal.App.4th 1713, 1720 [resolution authorizing county staff to negotiate and award an agreement was a project approval for statute of limitations purposes].)

We are not persuaded by Citizens' efforts to avoid this result. Below, Citizens asserted that no notice was given of the potential for tree removal activities until a neighbor/member observed the trees being cut down on January 5, 2011. Section 21167, subdivision (a) does not establish any special notice requirements for the 180-day statute of limitation to run; all that is required is that the public agency make a formal decision to "carry out or approve the project." (*Ibid.*; *Cumming v. City of San Bernardino* (2002) 101 Cal.App.4th 1229, 1235 [holding that the 180-day statute of limitations started to run from hearing on sale of property because scope of project "was disclosed in the public documents made available for review before the sale was approved"]; see also *County of Del Norte v. City of Crescent City* (1999) 71 Cal.App.4th 965, 980 [finding date city council held public hearing and enacted policy by formal motion to be date limitation period commenced].) Moreover, the administrative record clearly indicates adequate

agency, is distributed less than 72 hours prior to that meeting, the writing shall be made available for public inspection." (Gov. Code, § 54957.5, subd. (b)(1).)

24

public notice was given regarding the North Gateway Phase I project and its associated tree removal activities.

Nevertheless, Citizens argue that the limitation period should not be deemed to have run until they became aware of the tree removal activities, which they claim they first noticed on January 5, 2011. Citizens rely on *Concerned Citizens, supra,* 42 Cal.3d 929, to support their contention that the statute of limitations should be tolled in the instant case. Citizens' reliance on *Concerned Citizens, supra,* 42 Cal.3d 929 is misplaced. First, the test under *Concerned Citizens* is not confined to actual awareness of the challenged activities. Rather, the relevant inquiry is when the plaintiffs "knew or reasonably should have known that the project under way differs substantially" from the one described in the environmental review documents. (*Id.* at p. 939.) As discussed *ante*, the plaintiff group in *Concerned Citizens* challenged a fairgrounds arts theater seven years after the project had been approved. (*Id.* at pp. 933-934, 939.) There, the group asserted that their action was timely because it was filed a few days before the expiration of 180 days after the first concert was held, alleging that they "lacked actual or constructive notice of the changes before that time." (*Id.* at p. 939.) Our Supreme Court rejected this contention as being contrary to the Legislature's intent. (*Ibid.*) The court explained: "By providing in section 21167, subdivision (a) that the 180-day limitation period begins to run from the time a project is commenced, the Legislature determined that the initiation of the project provides constructive notice of a possible failure to comply with CEQA." (*Ibid.*)

The *Concerned Citizens* court further explained that it could "give effect to the statute, while simultaneously vindicating the Legislature's goal of promoting public comment on projects that may have environmental significance, by holding that the phrase 'commencement of the project' in subdivision (a) of section 21167 refers to the project described in the EIR and approved by the agency. However, if the agency makes substantial changes in a project after the filing of the EIR and fails to file a later EIR in violation of section 21166, subdivision (a), an action challenging the agency's noncompliance with CEQA may be filed within 180 days of the time the plaintiff knew

25

or reasonably should have known that the project under way differs substantially from the one described in the EIR." (*Concerned Citizens, supra,* 42 Cal.3d at p. 939.)

Here, as discussed, the Gateway Phase I project and related tree removal activities were within the scope of the Project described in the IS/MND. Moreover, even assuming for the sake of argument that the challenged activities did differ substantially from the Project described in the IS/MND, tree removal at CSM began on December 28, 2010, when trees along the West Perimeter Road were removed. Inasmuch as Citizens' petition, filed on July 1, 2011, was more than 180 days after December 28, 2010, their action is still time-barred even under a most generous interpretation of the statute of limitations.

In light of the foregoing, there is no need to examine the District's related claims that Citizens failed to properly exhaust their administrative remedies, as well as the issues relating to supplemental review. Similarly, we do not reach the District's claim of mootness, which is based on the fact that the challenged tree removal activities have long since been complete, and the trees have been or will be replaced in accordance with the mitigation measures set forth in the IS/MND.

### III. DISPOSITION

The judgment is reversed. The District is entitled to recover its costs on appeal.

_____
REARDON, ACTING P. J.


We concur:


_____
RIVERA, J.


_____
HUMES, J.

26

Trial Court:                    San Mateo County Superior Court


Trial Judge:                    Hon. Clifford Cretan


Counsel for Appellant:          Eugene Whitlock
                                Deputy County Counsel
                                San Mateo County Counsel

                                James G. Moose
                                Sabrina V. Teller
                                John T. Wheat
                                Remy Moose Manley LLP



Counsel for Respondents:        Susan Brandt-Hawley


1